AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>VI CHI HUYNH,<br>a.k.a. "Alex Huynh" | DOCKET NO.<br><br>CLERK U.S. DISTRICT COURT<br>JAN 1 3 2020<br>MAGISTRATE'S CASE NO.<br>20 MJ00149<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

| | | |
|---|---|---|
| Complaint for violation of Title 18, United States Code, Sections 1542 and 2(a) | | |
| NAME OF MAGISTRATE JUDGE<br>HONORABLE STEVE KIM | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
| DATE OF OFFENSE<br>July 13, 2018 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

## [18 U.S.C. §§ 1542 and 2(a)]

On or about July 13, 2018, in Los Angeles County, within the Central District of California, defendant VI CHI HUYNH, also known as "Alex Huynh" ("defendant") did willfully and knowingly furnish to another for use, and aided and abetted the use, of a passport bearing the name of P.L. and ending in the numbers 8408, which had been issued under the authority of the United States, and the issuance of which was secured by reason of a false statement made in the application, which falsely stated that the photograph submitted in the application was a genuine, current photograph of P.L. Defendant furnished said passport to another for use, and aided and abetted the use, of said passport, which was used to travel outside of the United States on or about July 21, 2018, in violation of Title 18, United States Code, Sections 1542 and 2(a).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>JAMAAL WESTBY<br><br>OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>January 13, 2020 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Catherine Ahn ext. 2424    REC: Detention    **STEVE KIM**

## AFFIDAVIT

I, Jamaal Westby, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against VI CHI HUYNH, also known as "Alex Huynh" ("HUYNH"), for violations of Title 18, United States Code, Sections 1542 and 2(a) (Use of a Passport Secured by False Statement and Aiding and Abetting).

2.   This affidavit is also made in support of an application for a warrant to search the person of HUYNH as described more fully in Attachment A-1, and the person of MICHAEL LE, also known as "Vu Anh Le," as described more fully in Attachment A-2.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 3146(a)(1) (Failure to Appear after Pre-Trial Release); 18 U.S.C. § 2(a) (Aiding and Abetting); 18 U.S.C. § 3 (Accessory After the Fact); 18 U.S.C. § 1546 (Fraud and Misuse of Visas, Permits, and Other Documents); 18 U.S.C. § 1542 (False Statement in a Passport and Use of a Passport Secured by False Statement); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 18 U.S.C. § 371 (Conspiracy) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and

1

information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and part only.

## II. BACKGROUND OF SPECIAL AGENT JAMAAL WESTBY

5.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI").  I have been a FBI Special Agent since
September 2017, and prior to this assignment, I was a sworn
Federal Officer with U.S. Customs and Border Protection from 2011
to 2017.  I am currently assigned to the Los Angeles Field
Office, Los Angeles International Airport squad, in Los Angeles,
California.  I have completed 22 weeks of training at the FBI
Academy in Quantico, Virginia, where I received formal training
in national security and criminal investigative techniques.

## III.  SUMMARY OF PROBABLE CAUSE[1]

6.    On January 16, 2018, LE was charged in a 22-count
First Superseding Indictment that alleged violations of 18
U.S.C. §§ 1344 (Bank Fraud) and 1028A (Aggravated Identity

---

[1] Unless otherwise specified, the interviews referenced in
this report were conducted by or with the assistance of FBI
Special Dana Murphy and the financial records, travel records,
and the results of digital devices searches referenced herein
were reviewed by or with the assistance of Special Agent Murphy.
Unless otherwise specified, my knowledge of those interviews,
records, and the results of digital device searches are
generally based on my discussions with Special Agent Murphy
and/or my review of relevant reports.

Theft).  See United States v. Michael Le, No. 2:17-CR-0055-RGK, Dkt. 98 (C.D. Cal. Jan. 16, 2018).  LE had previously been arrested pursuant to a complaint filed on August 23, 2017 and initially indicted on September 6, 2017.  (See id., Dkt. 1, 22.) In July 2018, LE absconded from pre-trial supervision and used a passport bearing numbers ending in 8408 (the "8408 passport") and the name of Pierre Le[2] ("P.L.") to board a flight from Mexico to Vietnam.  LE left behind multiple former romantic partners as well as HUYNH, who had previously identified himself as LE's fiancé and, according to financial records, had helped LE transfer significant amounts of money from accounts in LE's name to accounts in HUYNH's name while LE was detained.[3]

7.  A search of HUYNH's digital devices revealed Vietnamese-language messages between LE and HUYNH that took place after LE's flight from prosecution, in which LE and HUYNH discussed arrangements for LE to use the passport of an

---

[2] There is no known familial or romantic relationship between P.L. and defendant MICHAEL LE.

[3] On October 29, 2018, the Honorable Alexander F. MacKinnon, United States Magistrate Judge for the Central District of California, signed a warrant authorizing the search of HUYNH's person, which included authorization to search and seize any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that were within HUYNH's immediate vicinity and control at the location where the search warrant was executed. (See Case No. 2:18-mj-2865, Search Warrant Affidavit and Attachments A and B.)  The affidavit for the warrant is incorporated herein by reference.

In addition, on August 20, 2019, the Honorable Alka Sagar, United States Magistrate Judge for the Central District of California, authorized two additional federal search warrants pursuant to 18 U.S.C. § 2703, et seq. (See Case Nos. 19-mj-3434 and 19-mj-3435 (filed under seal) ("LE 2703 Warrants").)  The affidavits are also incorporated herein by reference.

individual identified as "Pierre," who Special Agent Dana Murphy identified as P.L. based on HUYNH's contact list.  According to an FBI interview with P.L., P.L. lived with LE and HUYNH from November 2017 to February 2018 after moving to Los Angeles from Texas.[4]  P.L. further stated that LE and HUYNH had been married in a ceremony that was witnessed only by P.L. and LE's sister. Los Angeles County records confirm that LE and HUYNH were married on or about November 29, 2017.

8.   Records from the U.S. State Department showed that a passport renewal application for P.L. had been submitted in June 2018, using P.L.'s real name and birthdate but bearing LE's photograph.  The application included instructions to mail the passport "In Care of" HUYNH to an address that corresponded to a Post Office ("P.O") box rented solely by HUYNH.  As a result of the June 2018 passport application, a U.S. passport bearing P.L.'s real name and birthdate, but bearing LE's photograph, was issued with numbers ending in 8408 ("the 8408 passport"). Travel records show that on or about July 21, 2018, approximately two weeks after LE's location monitor stopped communicating, someone used the 8408 passport to fly from Tijuana to Vietnam.

---

[4] On March 11, 2019, a federal search warrant to search the person of P.L. was authorized by the Honorable Joseph C. Spero, U.S. Chief Magistrate Judge for the Northern District of California.  (See Case no. 3:19-70370, Search Warrant Affidavit and Attachments A, B, and C.)  Based on the information the FBI case agent had at the time, it appeared that P.L. had admitted to knowing he had been issued the 8408 passport in a subsequent passport application; however, the case agent has since learned that the reference to the 8408 passport was made by a State Department reviewer, and not P.L.

## IV. **STATEMENT OF PROBABLE CAUSE**

9.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.  **Background on LE's Bank Fraud Schemes and Use of Romantic Partners' Accounts**[5]

10.  According to financial records obtained by the FBI, LE used bank accounts belonging to himself, as well as accounts belonging to family members and romantic partners, to perpetrate bank fraud schemes against Alliant Credit Union ("Alliant") and his former employer, Breitburn Energy Partners ("Breitburn"). The account holders for the accounts used by LE to transfer funds derived from his fraud scheme include LE's parents, H.L. and A.L., as well as four of LE's current and former romantic partners, H.N., D.P., T.S., and HUYNH.

11.  Financial institution records further showed that LE fraudulently opened an account with Alliant in the name of his father, H.L. (the "ACU account"), and used accounts belonging to H.L., A.L., D.P., and T.S. in or before June of 2015 to transfer and receive funds related to the ACU account. Specifically, LE would transfer funds into the ACU account, transfer funds out, and then claim the initial incoming transfer had been unauthorized, which required ACU to "reimburse" the funding account. LE also submitted fraudulent payment requests to his

---

[5] The facts in this section are as alleged in a criminal complaint signed by FBI Special Agent Dana Murphy and authorized by the Honorable Charles F. Eick, United States Magistrate Judge ("Complaint"), and in the First Superseding Indictment. See Le, No. 2:17-CR-0055-RGK at Dkts. 1, 98. The Complaint and First Superseding Indictment are incorporated herein by reference.

former employer, Breitburn, ostensibly on behalf of Breitburn clients, taxing agencies, and contractors, and then cashed the resulting check into H.N.'s account for eventual transfer by LE to himself or to A.L.'s account.

12. Based on FBI interviews with H.N., D.P., and T.S. — all former romantic partners of LE — LE encouraged his former romantic partners to open accounts and/or obtain safe deposit boxes at various financial institutions. LE also used financial accounts already opened by H.N., D.P., and T.S. LE then used a ruse of paying bills, wiring monies as gifts, or managing business transactions as a way to obtain continued access to the accounts. According to an FBI interview with T.S., T.S. and LE lived together until approximately August 2017.[6]

13. On August 24, 2017, LE was arrested at the Los Angeles International Airport while attempting to board a flight to Taipei, Taiwan, which – based on my discussions with Special Agent Murphy and my training and experience as an FBI Special Agent in LAX – I know is a common stopover city for flights to Vietnam. LE was arrested by Special Agent Murphy pursuant to a complaint and arrest warrant. Following his arrest at LAX, LE was detained at the Metropolitan Detention Center ("MDC") from August 25, 2017, to October 13, 2017. According to information provided by Special Agent Murphy, shortly after LE's arrest,

---

[6] The FBI has interviewed T.S. multiple times during the initial investigation and following LE's flight from prosecution. T.S. has no prior criminal history, and while T.S.'s information is largely consistent and T.S. had minimal contact with LE following LE's flight from prosecution, telecommunications records indicate that T.S. was in more contact with LE than disclosed during the interviews.

HUYNH appeared at one of LE's detention hearings and identified himself as LE's fiancé in a letter provided to the Court for its consideration.

14. Jail call records obtained from MDC and reviewed by FBI revealed that, during LE's detention from August 25, 2017, to October 13, 2017, LE and HUYNH were in constant communication. During this time period, LE's detention and potential bail conditions were being litigated, and, among other things, a condition was placed on LE's pretrial release that would have required LE to not "sell, transfer, or give away any asset valued at $10,000 or more without notifying and obtaining permission from the Court." (See Le, No. 2:17-CR-0055-RGK, at Dkt. 31 (Minutes of the Detention Hearing and Release Conditions).) However, according to discussions with the Pretrial Services Office in October 2017, these conditions would not apply until LE was released from detention. Financial records obtained and reviewed by FBI show that on or about September 1, 2017, LE granted HUYNH power of attorney, and LE and HUYNH transferred and attempted to transfer funds from financial accounts in LE's name or under LE's control to accounts in HUYNH name.[7]

15. Following LE's arrest, LE was indicted with violations of 18 U.S.C. §§ 1344 and 1028A (Bank Fraud and Aggravated Identity Theft), which was superseded on January 16, 2018 by a

---

[7] For further detail on the account transfers, see Affidavit, ¶¶ 12-19, Search Warrant for the Person of HUYNH, Case no. 18-mj-2865, and Affidavits, ¶¶ 16-22, LE 2703 Search Warrants.

22-count indictment charging LE with 21 counts of Bank Fraud and one count of Aggravated Identity Theft.

16. In July 2018, T.S. informed FBI that HUYNH had moved in and lived with LE after T.S. and LE's separation until approximately early 2018, when — according to information provided by LE to T.S. — LE asked HUYNH to move out. However, according to an FBI interview with P.L., HUYNH and LE were married prior to LE's flight from prosecution, but the marriage was not widely publicized and witnessed only by P.L. and LE's sister. According to Los Angeles County public records, LE and HUYNH were married on or about November 29, 2017.

**B.   A Fraudulently Obtained Passport Bearing P.L.'s Name and LE's Photograph is Sent to HYUNH and Used by LE to Flee to Vietnam in July 2018**

17. On or about July 6, 2018, LE absconded from pre-trial supervision after signing a plea agreement in which LE admitted to violations of 18 U.S.C. § 1344 (Bank Fraud). (See Le, No. 2:17-CR-0055-RGK at Dkt. 113, Plea Agreement.) Based on information provided by the Pretrial Services Office and reviewed by Special Agent Murphy, LE's location monitor was last seen communicating on or about July 6, 2018 at 8:01 p.m. before ceasing transmission. LE did not respond to attempts by the Pretrial Services Office to communicate with him, and a warrant was issued for LE's arrest on July 10, 2018. LE further failed to appear at his July 23, 2018 change of plea hearing before the Honorable R. Gary Klausner. (See id., Dkt. 118.)

18. In October 2018, travel records revealed that that HUYNH was on a return flight landing in Los Angeles, following a

8

trip to Vietnam.  HUYNH was searched pursuant to a federal
search warrant and interviewed at the airport.  I participated
in the search and interview of HUYNH, and saw that a phone
number was written on HUYNH's arm.  I later shared the phone
number with Special Agent Murphy, who determined that it was the
phone number for LE's defense attorney.

19.  As a result of the October 2018 search, the FBI seized
and searched HUYNH's digital devices.  The search revealed
photographs taken during HUYNH's trip that confirmed that HUYNH
had visited LE, who was residing in Vietnam.  The search further
revealed messages between HUYNH and LE that show, among other
things, LE and HUYNH making arrangements for LE to obtain a
passport from a person named "Pierre."  Special Agent Murphy
reviewed HUYNH's list of contacts for individuals named Pierre
and found an entry for P.L.[8]

20.  Messages reviewed by Special Agent Murphy from on or
about October 4, 2018 show LE telling HUYNH to have P.L. "take
care of his passport situation . . . so he doesn't get in
trouble."  LE also told HUYNH he was "worried for [P.L.] because
if he messes up he will get in trouble," and instructed HUYNH to
offer P.L. $5,000.  The application used by LE and HUYNH to
communicate is "Viber," an internet-based application that
allows users to make audio calls, including international calls,
to other Viber users.

---

[8] The messages were in Vietnamese and were reviewed with the
assistance of an FBI Vietnamese language translator.

21. According to State Department records, in June 2018, a passport renewal application was submitted using P.L.'s name and birthdate, but bearing a photograph that Special Agent Murphy recognized to be LE, not P.L.  Special Agent Murphy recognized the photograph to be LE based on her review of records in this case, including LE's California Department of Motor Vehicle's photograph and her prior interaction with LE.  Furthermore, the passport application listed as its mailing address the following address:  "10643 Valley Blvd Unit C #126 . . . In Care Of – Vi Huynh" (the "Valley Boulevard location").

22. On April 29, 2019, Special Agent Murphy traveled to the Valley Boulevard location and determined that the address corresponded to a business called "The UPS Store."  Special Agent Murphy interviewed S.C., the owner of The UPS Store, who recognized the address as corresponding to a P.O. box that was rented solely by HUYNH.  S.C. remembered HUYNH because HUYNH had attempted to receive mail for another person at the P.O. box.  According to S.C., HUYNH was told that HUYNH was not allowed to receive mail for individuals who were not named on the rental application, and if HUYNH wanted to add more persons to the P.O. box rental application, they would need to personally appear.  S.C. further stated that only the persons named on the rental application are allowed to collect mail from the rented P.O. box.  S.C. showed Special Agent Murphy a piece of mail addressed to LE that HUYNH had received at his P.O. box around April 29, 2019, after S.C. warned HUYNH that he could not receive mail addressed to other persons.

23.   According to State Department records reviewed by State Department Special Agent Luke Williamson, as a result of the fraudulent passport application, a passport was issued under the authority of the United States government with numbers ending in 8408.  The 8408 passport was issued bearing P.L.'s name and birthdate, but included LE's photograph.  According to State Department records, the 8408 passport was mailed from Portsmouth, New Hampshire, on or about July 13, 2018, to the same address listed in the fraudulent passport application — specifically, to HUYNH's P.O. box at the Valley Boulevard location, "In Care Of – Vi Hyunh."

24.   Travel records show that, on or about July 21, 2018, someone used the 8408 passport to fly from Tijuana to Vietnam. Based on travel records showing that someone using the 8408 passport flew from Tijuana to Vietnam on or about July 21, 2018, and LE's failure to respond to his supervising Pre-Trial Services officer after his location monitor ceased communicating on or about July 6, 2018, I believe the LE crossed out of the United States to Mexico sometime on or after July 6, 2018, and used P.L.'s 8408 passport to flee to Vietnam.

25.  I know from my training and experience that individuals, such as LE, who are experienced in bank fraud may use multiple financial accounts, including accounts not in their name, to transfer funds related to their fraud schemes.  I also know from my training and experience that fugitives from justice may use fraudulently obtained or fraudulently altered forms of identification and accounts to obscure their identities and

locations from law enforcement.  Fugitives from justice may use
sources of funding based on their fraudulently obtained
identities, such as accounts in names that are not their own, as
well as sources of funding that cannot be directly traced to
their real identities, such as cash, accounts held in the name
of uncharged associates, or other items of value, in order to
avoid attribution or detection by law enforcement.  Based on the
information obtained through the course of the investigation
into LE's charged conduct, in which LE used accounts in the
names of former romantic partners to transfer funds related to
his fraud schemes, financial records showing accounts being
transferred out of funds in LE's name into accounts in HUYNH's
name during LE's post-arrest detention, HUYNH's involvement in
obtaining the 8408 passport and LE's request that HUYNH provide
funds to P.L., I believe there is probable cause to believe LE
is using fraudulently obtained identification documents to avoid
detection from law enforcement, that HUYNH helped LE
fraudulently obtain identification to avoid detection from law
enforcement, and that HUYNH is assisting LE in the transfer or
use of funds in a manner that avoids attribution to LE.

26.  In March 2019, Special Agent Murphy reviewed travel
records associated with P.L. and learned that P.L. was returning
to San Francisco International Airport from Vietnam, and
obtained a federal search warrant authorizing a search of P.L.'s
person.  P.L. consented to a voluntary interview on or about
March 12, 2019, and denied knowingly providing or assisting LE
in obtaining a new passport in P.L.'s name.  P.L. stated that he

simply believed he had lost his prior passport sometime between August 2017 and February 2018, had never submitted the June 2018 passport renewal application nor received the resulting 8408 passport, and, based on P.L.'s belief that his passport had gotten lost, submitted an application for a new passport in November 2018.  P.L. stated that he had lived briefly with LE and HUYNH in LE's residence in Los Angeles, California from November 2017 to February 2018 after moving there from Texas, and assumed it had gotten lost sometime during the move.  P.L. further denied that he had been paid by either LE or HUYNH for a new passport, and stated he had last communicated with LE and HUYNH in April 2018.

### C.    HUYNH Applies for a New Passport in December 2018

27.  According to State Department records, in December 2018, shortly after HUYNH was stopped and interviewed at the Los Angeles International Airport by FBI regarding LE's flight from prosecution, HUYNH submitted a new passport application.  The application lists HUYNH's name, birthdate, and appears to bear HUYNH's photograph.  However, the application included a Statement Regarding a Lost or Stolen U.S. Passport Book and/or Card (Form No. DS-64 06-2015), in which HUYNH states, upon penalty of perjury, that HUYNH had "left my passport book in the backpack when my aunt cleaning my room she throw away the backpack from the trash can of my aunts [sic] house 8374 Sierra Bonita Ave Rosemead 91770 CA."

28.  As a result of HUYNH's passport application, HUYNH was issued a new U.S. passport bearing the numbers ending in 7874

(the 7874 passport). However, HYUNH still has, and has traveled using, his Vietnamese passport. On or about January 16, 2019, according to travel records, HUYNH traveled to Vietnam using his Vietnamese passport ending in 0294 and returned to LAX on or about March 13, 2019 using the 7874 passport.

29. On January 6, 2020, FBI Special Agent Murphy and State Department Special Agent Williamson traveled to the address associated with HUYNH's aunt on HUYNH's December 2018 U.S. passport application. With the assistance of an FBI Vietnamese interpreter, the Special Agents interviewed HUYNH's aunt, Y.C., and HUYNH's cousins, S.P. and V.D., who lived at the listed address. According to Y.C., HUYNH does not have a room at the listed address and she never threw away HUYNH's backpack or anything belonging to HUYNH. S.P., who owns the house at the listed address, also informed the agents that HUYNH does not live at that address and did not keep any personal belongings there between 2017 and 2019. S.P. also showed Special Agents Murphy and Williamson recent social media postings by HUYNH showing HUYNH in Thailand. According to travel records, HUYNH departed Los Angeles on an extended trip to Asia, including Vietnam, in December 2019, and is expected to return in early February 2020. Based on HUYNH's ongoing relationship with LE, HUYNH's prior trips to Vietnam to visit LE, the length of HUYNH's trip to Asia, and its inclusion of a trip to Vietnam, Special Agents Murphy and Williamson determined it was likely HUYNH was visiting LE and may be traveling with LE in Thailand.

## V.  **TRAINING AND EXPERIENCE REGARDING BANK FRAUD AND IDENTITY THEFT**

30.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.    It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information or "profiles," often for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.    It is a common practice for those involved in identity theft or bank fraud to use either false identification or stolen real identification to make purchases with stolen

access devices at retail stores in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions on their person.

c.    It is common for identity thieves, and individuals engaged in bank fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  Software relevant to such schemes can often be found on digital devices, such as computers.  Such equipment and software are often found on fraudsters' persons and on their digital devices.

d.    Oftentimes identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

e.    Based on my training and experience, I know that individuals who participate in identity theft and bank fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES[9]**

31.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

_____

[9] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

32.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LE and/or HUYNH's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of LE and/or HUYNH's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

34. For all of the reasons described above, there is probable cause to believe that VI CHI HUYNH has committed violations of Title 18, United States Code, Sections 1542 and 2(a) (Use of a Passport Secured by False Statement and Aiding and Abetting), and probable cause to believe that the items to

be seized described in Attachment B will be found in a search of the persons described in Attachments A-1 and A-2.

_____
Jamaal Westby, Special Agent
FEDERAL BUREAU OF
INVESTIGATION

Subscribed to and sworn before me this __13__ day of January, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

**STEVE KIM**

21

## ATTACHMENT A-1

<u>PERSON TO BE SEARCHED</u>

The person of Vi Chi HUYNH, also known as "Alex Huynh," date of birth October 4, 1984, with California Driver's License Number D9831002 and United States Passport Number 590377874. HUYNH's California Department of Motor Vehicle record lists him as standing five foot, nine inches tall with black hair and brown eyes.

The search of HUYNH shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within HUYNH's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a body cavity search or a strip search.

## ATTACHMENT A-2

<u>PERSON TO BE SEARCHED</u>

The person of Michael LE, also known as "Vu Anh Le," date of birth October 22, 1985, with California Driver's License Number Y3470993.  LE's California Department of Motor Vehicle record lists him as standing five foot, seven inches tall with black hair and brown eyes.

The search of LE shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within LE's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a body cavity search or a strip search.

**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 3146(a)(1) (Failure to Appear after Pre-Trial Release); 18 U.S.C. § 2(a) (Aiding and Abetting); 18 U.S.C. § 3 (Accessory After the Fact); 18 U.S.C. § 1546 (Fraud and Misuse of Visas, Permits, and Other Documents); 18 U.S.C. § 1542 (False Statement in a Passport and Use of a Passport Secured by False Statement); 18 U.S.C. § 1028A (Aggravated Identity Theft); and 18 U.S.C. § 371 (Conspiracy) (collectively, the "Subject Offenses"), namely:

a.    Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than LE or HUYNH, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.    Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

i

c.    Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.    Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

f.    Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

g.    Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of, LE or HUYNH;

h.    Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

i.    Contents of any calendar or date book stored on any of the digital devices;

j.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

k.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

l.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

m.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

n.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

o.    Audio recordings, pictures, video recordings, or still captured images of financial account or personal

information, or the collection or transfer of the proceeds of the Subject Offenses;

  p. Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

  q. Indicia of occupancy, residency or ownership of physical premises, including locations outside of the United States, such as forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing; and

  r. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

  s. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

   i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.  evidence of the times the device was used;

    vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii.    records of or information about Internet Protocol addresses used by the device;

    ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); *peripheral* input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

5.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

6.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

7.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

8.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

9.   The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

10.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was

encountered, including how it was immediately apparent contraband or evidence of a crime.

11.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

12.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

13.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

14.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

15.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

16.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

17.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

18.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

19.   Any magnetic, electronic, or optical storage device capable of storing digital data;

20.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

21.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

22.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

23.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

24.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the

government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

25.   During the execution of this search warrant, law enforcement is permitted to: (1) depress LE and/or HUYNH's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of LE and/or HUYNH's face with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

26.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.